IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-41152
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GUADALUPE CRISTINO JIMENEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(M-96-CR-104-1)
_____
November 7, 1997

Before REYNALDO G. GARZA, KING, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Guadalupe Cristino Jimenez was convicted following a jury trial of conspiracy to possess with intent to distribute more than 100 but less than 1000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846 and of possession with intent to distribute more than 100 but less than 1000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. Jimenez was

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

sentenced to a term of imprisonment of fifty-one months on each count, the terms to run concurrently, and to be followed by concurrent four-year terms of supervised release. Jimenez appeals on two grounds: (1) that the evidence presented at trial was insufficient for the jury to find him guilty of each count, and (2) that the district court erred in declining to reduce Jimenez's offense level for acceptance of responsibility. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial showed that Jimenez was scheduled to drive a tractor-trailer rig (the "Rig") fully loaded with produce from Texas to Illinois on May 6, 1996. Jimenez signed bills of lading showing that he was transporting a full load of cantaloupes, onions, and cabbages.

Having previously picked up 336 cartons of cantaloupes from the Progreso Produce company, Jimenez proceeded to Holden Wallace, Inc., a produce house in Donna, Texas, where the remainder of the Rig's trailer was filled with cartons of cabbage and cartons and sacks of onions. Jimenez left Holden Wallace at approximately 1:00 a.m. on the morning of May 7, 1996.

The Texas Department of Public Safety, having apparently obtained information indicating that the Rig was transporting narcotics, placed the Rig under surveillance. At 9:00 a.m., narcotics agents observed the Rig parked at the Thermo-King

repair shop, ostensibly for the purpose of having its "reefer"-- the refrigeration unit on the trailer--repaired. Personnel at Holden Wallace had checked the Rig's reefer before filling its trailer and found it to be in proper working order. Jimenez did not contact the produce house to inform it that he had stopped for repairs.

Narcotics agents observed a blue pickup truck that was also under investigation pull into Thermo-King's outside parking lot. The pick-up was driven by Nora Alicia Dominguez. Dominguez subsequently left in the blue pickup truck with Jimenez in the passenger seat and drove to the Tex Mart convenience store. Dominguez parked the truck in front of the store and made a telephone call at a pay phone in the parking lot. Shortly thereafter, a black Ford Mustang occupied by three Hispanic males pulled into the Tex Mart parking lot. Dominguez and Jimenez spoke with the occupants of the Mustang, and then got back in the blue pickup truck. Both vehicles headed south to the Casa del Taco restaurant in McAllen. At approximately 11:00 a.m., Dominguez, Jimenez, and the occupants of the Mustang entered the restaurant. At approximately 12:00 p.m., they departed. Dominguez and Jimenez drove back to Thermo-King in the pickup. Jimenez left Thermo-King in the Rig, followed by Dominguez in the pickup. Jimenez and Dominguez drove the two vehicles to the Silver Spur truck stop in Pharr, Texas. Jimenez exited the Rig and rejoined Dominguez in the blue pickup truck. Dominguez and

3

Jimenez left the truck stop at around 12:30 p.m. and returned approximately four hours later. No one opened the doors of the Rig's trailer during this four hour period.

Jimenez then drove the Rig to a warehouse in Pharr and backed it into a rental stall, where the Rig remained for approximately one hour. Narcotics agents observed Jimenez talking to Dominguez in the parking lot outside the warehouse compound. Later, narcotics agents discovered two empty cantaloupe boxes in the stall that the Rig had occupied. Rescimo De La Pina, the manager of the warehouse, testified that the rental stall used by the Rig was not currently rented to anyone and that the most recent tenant, an individual named Hinojosa, vacated the space in February 1996 and never returned his keys to the stall and the main gate.

Jimenez left the warehouse in the Rig heading north toward the United States Border Patrol checkpoint at Falfurrias, Texas. Gilbert Silvas, the Border Patrol agent on duty, received word that the Rig was the subject of a narcotics investigation. State narcotics agents supplied Silvas with the Rig's license plate number and the name of the driver.

When the vehicle was stopped at the checkpoint, Silvas approached Jimenez. Silvas found Jimenez to be "a little nervous" and observed that Jimenez had difficulty retrieving his resident alien card from his wallet because he was shaking badly. Silvas verified that Jimenez's identification matched the name

4

given him by narcotics agents and asked Jimenez if he could inspect the Rig. Jimenez consented and pulled the Rig into a secondary area, where he proceeded to exit the Rig and open the doors of its trailer without any reluctance.

A Border Patrol agent placed a drug-sniffing dog in the trailer, and the dog alerted that the trailer contained illegal drugs. Border Patrol agents crawled into the trailer and found cellophane-wrapped bundles near the bottom and toward the middle of the trailer. The parties stipulated that the bundles contained a total of 175 kilograms of marijuana.

Border Patrol agents placed Jimenez under arrest and read him his <u>Miranda</u> rights. The agents allowed Jimenez to drive the Rig to a warehouse where it was unloaded. When the Rig's load of produce was eventually delivered to its destination in Illinois, it contained approximately 2,500 pounds less produce than the bills of lading for the shipment indicated.

Jose Ortiz, a state narcotics investigator, interviewed Jimenez later in the evening. Jimenez told Ortiz that he had loaded the Rig with produce and then taken it to the Silver Spur to have some work done on it. Jimenez stated that he ate lunch with Dominguez, but became silent when asked about the three men in the black Mustang. Jimenez claimed that he returned to the Silver Spur after lunch and headed north in the Rig. Jimenez claimed that a man approached him about transporting controlled substances in the Rig. Narcotics agents conducting surveillance

5

of the Silver Spur observed no such encounter. Jimenez also acknowledged that, prior to his arrest, he believed that he was carrying illegal drugs in the Rig, but did not know what type of drugs.

Jimenez made motions for acquittal after the government rested and at the conclusion of the trial, and the district court denied both motions. The jury returned a verdict of guilty as to both the charges of conspiracy to possess with intent to distribute more than 100 but less than 1000 kilograms of marijuana and of possession with intent to distribute more than 100 but less than 1000 kilograms of marijuana.

The presentence investigation report (PSR) recommended that Jimenez not receive a reduction in his offense level for acceptance of responsibility because, during a presentence interview, he claimed that he was unaware of the presence of the marijuana in the trailer and was merely following the instructions of the Rig's owner. He also claimed during the interview that he went to the warehouse in Pharr to get some tires changed on the Rig. At the sentencing hearing, Jimenez objected to the PSR's recommendation that he not receive a downward departure for acceptance of responsibility. He based his objection solely on the ground that he had debriefed with the government regarding his involvement in the offenses of which he was convicted.

## II. DISCUSSION

Jimenez contends on appeal that insufficient evidence existed to convict him of either possession with intent to distribute or conspiracy to possess and distribute the marijuana found in the Rig. Jimenez also argues that he is entitled to a reduction in his offense level for acceptance of responsibility. Both of Jimenez's contentions lack merit.

### A. Sufficiency of the Evidence

### 1. Standard of review

"We review sufficiency-of-the-evidence challenges to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Alix, 86 F.3d 429, 435 (1996). In conducting our review, we are mindful that the jury is "'free to choose among all reasonable constructions of the evidence.'" United States v. Chaney, 964 F.2d 437, 448 (5th Cir. 1992) (quoting United States v. Berisha, 925 F.2d 791, 795 (5th Cir. 1991)). Therefore, we construe all reasonable inferences from the evidence in favor of the jury verdict. United States v. Garza, 990 F.2d 171, 174 (5th Cir. 1993).

### 2. Possession with intent to distribute

In a prosecution for possession with intent to distribute, the government must prove three elements beyond a reasonable doubt: "(1) knowing (2) possession of a controlled substance (3)

7

with intent to distribute it." United States v. Gonzales, 121 F.3d 928, 936 (5th Cir. 1997). Jimenez contends that the government did not prove beyond a reasonable doubt that he knew that the trailer of the Rig contained marijuana. This argument lacks merit.

"[K]nowledge can be inferred from control over the vehicle in which the drugs are hidden 'if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" Garza, 990 F.2d at 174 (quoting United States v. Anchondo-Sandoval, 910 F.2d 1234, 1236 (5th Cir. 1990)). "Additional evidence of guilt may come from nervousness, inconsistent statements, implausible stories, or possession of large amounts of cash by the defendants." United States v. Pennington, 20 F.3d 593, 598 (5th Cir. 1994).

Jimenez was found in possession of a vehicle carrying 175 kilograms of marijuana, and additional evidence indicated that Jimenez had knowledge that marijuana was present in the truck. First, Jimenez admitted that he believed that the Rig contained illegal drugs, but that he was unsure of the type of drugs. Second, he stated that a man approached him at the Silver Spur about transporting drugs, a story rendered implausible by the narcotics agents' surveillance reports. Third, the jury had before it evidence that Jimenez seemed nervous and his hands were shaking at the time that he was stopped at the border checkpoint. Additionally, the jury could have inferred Jimenez's intent to

distribute the marijuana from his possession of such a large amount of contraband. See United States v. Lopez, 979 F.2d 1024, 1031 (5th Cir. 1992).

Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found Jimenez guilty of possession with intent to distribute marijuana.

### 3. Conspiracy

"A conviction for a narcotics conspiracy requires proof beyond a reasonable doubt (1) that two or more people agreed to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator participated in the conspiracy." Alix, 86 F.3d at 436. Jimenez argues that there was a complete lack of evidence of an agreement between Jimenez and any other person to violate federal drug laws. This argument fails.

In proving up a charge of conspiracy, the government need not prove the existence of an explicit agreement to conspire; a tacit agreement is sufficient. See United States v. Greenwood, 974 F.2d 1449, 1457 (5th Cir. 1992). Circumstantial evidence may establish the existence of such an agreement. See United States v. Tencer, 107 F.3d 1120, 1132 (5th Cir. 1997). When the government attempts to prove the existence of a conspiracy by circumstantial evidence, it must clearly establish each link in the inferential chain, and cannot merely pile inference upon

9

inference in order to establish the charge. <u>United States v. Mackay</u>, 33 F.3d 489, 493 (5th Cir. 1994); <u>United States v. Galvan</u>, 693 F.2d 417, 419 (5th Cir. 1982). "A conspiracy conviction does not depend on the identification of the co-conspirators. The co-conspirators need not be identified as long as evidence supports 'the proposition that such a co-conspirator did exist and that the defendant did conspire with him.'" <u>United States v. Moree</u>, 897 F.2d 1329, 1332 (5th Cir. 1990) (quoting <u>United States v. Pruett</u>, 551 F.2d 1365, 1369 (5th Cir.1977)).

The totality of circumstances established by the evidence in this case supports the jury's conclusion that Jimenez was involved in a conspiracy to violate the drug laws. The sheer volume of marijuana involved, coupled with the time constraints surrounding its being loaded into the Rig, indicates that Jimenez was not the only person involved in the drug trafficking scheme. <u>See</u> <u>United States v. Price</u>, 869 F.2d 801, 804-05 (5th Cir. 1989) (concluding that sufficient evidence existed to convict the defendant of conspiracy to possess with intent to distribute five kilograms of cocaine and noting that "the sheer volume of the cocaine involved indicates that the defendant could not have loaded it alone"). The jury could have concluded from the evidence that the marijuana was placed in the trailer at the warehouse in Pharr, and therefore that Jimenez did not load the contraband by himself. First, the evidence indicates that the

10

Rig contained no marijuana when it left the Wallace Holden produce house at 1:00 a.m. on May 7. Second, the warehouse stall where narcotics agents observed the Rig from 4:30 p.m. to 5:30 p.m. on May 7 was unrented, which indicates that Jimenez was trespassing on the premises and had no legitimate reason to be there. Third, narcotics agents found cantaloupe boxes inside the stall. This evidence would allow a reasonable juror to conclude that the marijuana was loaded into the Rig at the warehouse. It is simply implausible to believe that, in one hour's time, Jimenez acting alone could have unloaded enough produce from the Rig to hide 175 kilograms of marijuana near the bottom layer of boxes in the middle of the trailer and then reload boxes on top of it. Such a scenario is rendered even more improbable by the fact that, during a portion of the hour that the Rig was parked at the warehouse, narcotics agents observed Jimenez conversing with Dominguez in a parking lot outside the warehouse compound.

Additionally, Jimenez told narcotics officers that an unidentified man approached him outside the Silver Spur truck stop and offered him money to transport illegal drugs in the Rig. The fact that this statement is in some degree inconsistent with the surveillance reports of the narcotics agents does not indicate that it cannot serve as evidence of a conspiracy. The jury was entitled to credit the portion of Jimenez's statement indicating that a prospective co-conspirator offered him money to carry illegal drugs in the Rig and reject the portion of his

11

statement indicating that the offer was made on May 7 outside the Silver Spur truck stop.  See United States v. Pruneda-Gonzalez, 953 F.2d 190, 196 n.9 (5th Cir. 1992) (observing that the jury "is afforded the latitude to 'choose to believe part of what a witness says without believing all of that witness's testimony'" (quoting United States v. Merida, 765 F.2d 1205, 1220 (5th Cir. 1985))).

Moreover, after surveillance of Jimenez and the Rig began at 9:00 a.m. on May 7, narcotics agents observed Jimenez in the company of Dominguez and three unidentified men.  Additionally, narcotics agents observed Dominguez near the warehouse during the time period when, in all likelihood, the marijuana was being loaded into the Rig.  Although an individual's mere presence at the scene of criminal activity is insufficient to establish that the individual is a co-conspirator in the activity, such presence is a valid factor for the jury to consider along with other evidence in determining whether a conspiracy existed.  See United States v. Martinez-Moncivais, 14 F.3d 1030, 1034 (5th Cir. 1994) (concluding that an individual's presence at the center of the conspiracy's criminal activity on more than an isolated or random occasion may be a valid factor to consider in determining whether the individual is engaged in criminal activity).

In light of the foregoing, the jury could have concluded, without simply piling inference upon inference, that Jimenez was involved in a criminal conspiracy.

## B. Acceptance of Responsibility

Jimenez argues that the trial court erred in refusing to reduce his offense level by two points for the acceptance of responsibility because he cooperated with the government with respect to his involvement and was debriefed.  He also argues that he acknowledged responsibility for his offense at his sentencing.[1]  We disagree.

A defendant who "clearly demonstrates acceptance of responsibility for his offense" is entitled to a two-level decrease of his offense level.  U.S. SENTENCING GUIDELINES MANUAL § 3E1.1(a) (1995).  "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Id. § 3E1.1 cmt. 2.  In "rare situations" in which the defendant exercises his constitutional right to go to trial to preserve issues that do not relate to his factual guilt, he may be

_____

[1]  Jimenez also argues that the fact that he was convicted after a jury trial is irrelevant to his entitlement to a downward departure for acceptance of responsibility because it is constitutionally impermissible to punish a citizen for asserting his constitutional right to a jury trial.  This argument is specious.  To accept it would be to conclude that the plea bargaining is an unconstitutional practice because it provides criminal defendants with an incentive not to exercise their constitutional right to a jury trial.  This is not the case.  See Town of Newton v. Rumery, 480 U.S. 386, 393 (1987) ("[I]t is well settled that plea bargaining does not violate the Constitution even though a guilty plea waives important constitutional rights.").

13

entitled to the adjustment.  See id.  This court's review of the district court's determination regarding the applicability of this adjustment "is more deferential than the clearly erroneous standard."  United States v. Burian, 19 F.3d 188, 192 (5th Cir. 1994).

Jimenez did not admit to his involvement in the charged offenses prior to his trial.  After the trial, Jimenez apparently provided the government with some information, but he did not give a complete debriefing until the day before his sentencing.  Jimenez has not argued that he proceeded to trial in order to preserve a constitutional issue that was unrelated to his factual guilt.  To say the least, Jimenez has not demonstrated that the district court clearly erred in denying him an adjustment of his offense level based on his acceptance of responsibility.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction and sentence of the district court.